[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, the executor of the estate of Sophie Stasulewicz, brings this action to retrieve funds that the defendant, Edward Janik, obtained from accounts originally opened by the decedent. The plaintiff contends that the defendant wrongfully obtained the funds in the accounts and seeks a judgment from this court restoring the funds to the decedent's estate.
Following a trial in this matter, the court finds the following facts to be proven. In 1995, the decedent, Sophie Stasulewicz, first considered devising a will. She contacted the plaintiff to discuss this. The plaintiff was the attorney who had prepared the wills of her brothers. After meeting three times with the decedent, the plaintiff prepared a draft of a proposed CT Page 9836 will. On March 3, 1997, the decedent signed the final version of the will which divided her assets equally among her 5 nieces and nephews: Maryann, Bernadette and Stanley Deptula, and Edward and Joseph Janik. Upon signing her will, the decedent expressed pleasure about what she had done, and celebrated with the plaintiff and the witnesses to the will by partaking in a glass of wine with them.
There is no dispute that the decedent was legally competent when she signed her will in March 1997. Her medical course deteriorated, however, over the ensuing months. By May 1997, she needed assistance mentally and physically. Finally, on June 1, 1997, the decedent was admitted to New Britain General Hospital for congestive heart failure, critical aortic stenosis, conjunctivitis in both eyes, acute bronchitis, dehydration and anemia. The decedent never returned to her own home. She was transferred from the hospital to Mediplex in Newington, a convalescent facility. Her attending physician, Dr. Malkin, offered the opinion at trial that in June and July of 1997 the decedent was mentally incompetent, an opinion at trial that is well supported by the medical record. During those months she was unable to make her own decisions regarding her medical care.
Prior to and during her illness, the decedent had two nephews, Edward Janik, the defendant and Joseph Janik, his brother, who assumed the bulk of the responsibility for her. The defendant visited the decedent often, provided care for her and acted as a liaison and advocate with her health care providers. While the decedent was in the hospital, the defendant visited her regularly. He had been appointed her Health Care Agent in 1993. Therefore, when the decedent was transferred from New Britain General Hospital to Mediplex, the defendant was the individual who signed the "Do Not Resuscitate" Form, the "Authorization for Release of Information" Form, the "Permission to Discuss Medical Care" Form, and other necessary documents on the decedent's behalf. The defendant was also the individual who made medical decisions for the decedent during her hospitalization. Though the defendant vigorously disputed his active role in the medical care rendered to his aunt, the testimony of his aunt's doctor and references to him in the medical records belie these assertions. The defendant played an important and critical role in the care of his aunt during her hospitalization. She relied on him and entrusted him with decision-making authority.
Though a woman with humble origins, the decedent amassed a CT Page 9837 sizable estate during her life. At the time that she was in the hospital, she had four bank accounts which held approximately $180,000.00. In addition, she owned stocks in Stanley Works which were valued at $11,644.06 just prior to her death in July 1997. Finally, she owned a home which was unencumbered and had an equity of approximately $99,000.00.
On June 11, 1997, on the day the decedent was transferred from New Britain General Hospital to Mediplex, she added the defendant to her People's Savings Bank account and granted him a right of survivorship. On June 12, 1997, the decedent added the defendant to two more of her accounts, two American Savings Bank accounts, again granting him a right of survivorship. On June 24, 1997, the decedent sold her shares of Stanley Works stock and the money was deposited in one of her four bank accounts. Then, on July 3, 1997, the decedent signed a letter addressed to "Dear Sir", requesting that her nephew be added to her Derby Savings Account. On July 16, 1997, the decedent died in Mediplex. On July 17, 1997, the defendant closed out all of the accounts to which his aunt had added him.
On August 20, 1997, the plaintiff requested that the defendant return the assets from the bank accounts, contending that the defendant had obtained them through fraud or undue influence. When the defendant refused to do so, the plaintiff initiated this action, alleging conversion, constructive fraud, and undue influence. The defendant maintains that he is in valid possession of the funds from his aunt's bank accounts because she added him to them before her death. The defendant argues that her wish, before her death, was to leave him and his brother the majority of her assets because of the care they had given her.
This court finds that, although there is logic and reason behind the theory that the decedent would want to bequeath to her dutiful and attentive nephew most of her earthly possessions, she was not mentally competent at the time she signed the signature cards and letter to add him to her bank accounts. Had she signed the documents one month earlier, this court would not have struggled with this most troubling matter. Having added him to her accounts without the legal competence to do so, the decedent's acts were a legal nullity. Therefore, the defendant is not legally entitled to the funds and they must be returned to the plaintiff.
This court finds that the plaintiff has failed to prove that CT Page 9838 the defendant unduly or fraudulently influenced his aunt in order to persuade her to add him to her accounts. The sinister plot that the plaintiff would like for this court to read into the subtext of the interactions between nephew and aunt are not sufficiently established by the facts in this case. Neither did the plaintiff fully prove that the defendant held a "special and fiduciary relationship" with his aunt, which is a prerequisite of proving fraud. The court can and did draw negative inferences from the fact that the defendant obtained and provided to his aunt the documents necessary to make him beneficiary to a small fortune while, contemporaneously, the hospital notes depicted her as disoriented, confused, possessed of poor insight and with impaired short term memory. This negative inference, however, ultimately only supports an appearance of impropriety. There are insufficient facts for this court to conclude that the impropriety actually occurred.
Nevertheless, it is quite clear that during her hospitalization, there were serious questions as to the decedent's competence. From her initial admission, when she was confused and disoriented, to the last several days of her life, when she stopped talking entirely, the decedent was not able to make her own medical decisions alone; nor was she able to care for herself. In fact, she was unable to complete evaluations to determine the extent of her cognition while in Mediplex because of decreased and inconsistent responsiveness.
The defendant would like for the court to discount the reports that the decedent was confused in the hospital and in the convalescent home because prior to her hospitalization she had had long periods of, what was characterized by home health care providers as, confusion. Unlike the defense, this court views this fact as strengthening the foundation for the conclusion that she was incompetent in the hospital. No one can dispute that while she was on her own, she was competent, but she had preliminary signs of mental deterioration. These signs of deterioration increased over the months. By the time she entered the hospital in June, the confusion, which had not rendered her incompetent in March, increased due to her medical condition, rendering her incompetent.
Ultimately, this court credits the evidence provided in the medical records of New Britain General Hospital and Mediplex with painting the most accurate and unbiased portrait of the decedent. The medical chart, maintained for purposes other than litigation CT Page 9839 and authored by individuals motivated by intentions other than personal, is the best evidence that the decedent was not competent after June 1, 1997 through her death. Dr. Malkin appeared in court to express this opinion and to provide a synopsis of the record, which supported this conclusion.
Given the weight of the evidence, this court is forced to conclude that the decedent was not competent when she added the defendant to her accounts, therefore, though he believed he had a legal entitlement to them, upon demand for return from the plaintiff, the defendant's refusal constituted conversion.
CONVERSION
"An action of conversion is a suit for damages by the owner of a chattel or by one entitled to the immediate possession of the chattel, against one who has wrongfully appropriated the chattel or has tampered with the chattel in derogation of the rights of the rightful owner or possessor." D. Wright, J. Fitzgerald W. Ankerman, Connecticut Law of Torts (3d Ed. 1991) § 25, p. 38. "A conversion can result from any conduct intended to affect chattel." Prosser Keeton, Torts, § 15, (5th Ed). There are two types of takings that can give rise to a conversion: the first arises from a tortious taking; the second arises when the possession is originally rightful but becomes wrongful by reason of wrongful detention or wrongful use.Coleman v. Francis, 102 Conn. 612, 616, 129 A. 718 (1925). In the first type of conversion, demand for the return of the property is not necessary. In the second, demand and refusal are required before a conversion action can be brought. The plaintiff argues in his post-trial brief that the defendant tortiously took the decedent's property because he exercised undue influence upon her. As stated earlier, the court finds, that although there are some supporting facts for this argument, the plaintiff does not prevail on the claim of undue influence. However, given that this court concludes that the decedent was not competent to create the joint accounts with a right to survivorship, it finds that the defendant was not entitled to funds from the accounts. When he failed to return the funds upon demand, he converted the funds.
The legal principle guiding this court's analysis is one found in the early case of Parker v. Middlebrook, 24 Conn. 207,209 (1855). That case set forth the rule that one who obtains goods to which he is not legally entitled, in good faith, is subject to an action of conversion after the rightful owner makes CT Page 9840 a demand for return, to which the possessor of the goods refuses. This rule has been followed and applied in countless other cases decided by our Supreme Court. See, e.g., Atlas Assurance Co.,LTD. v. Gibbs, 121 Conn. 188, 183 A. 690 (1936); Coleman v.Francis, 102 Conn. 612, 129 A. 718 (1925) ; Metropolis Mfg. Co.v. Lynch, 68 Conn. 4591 36 A. 832 (1896) ; and Gilbert v.Walker, 64 Conn. 390, 30 A. 132 (1894)
The issue at the heart of this matter is whether the defendant has a legal entitlement to the funds in the accounts previously held by his aunt. Though in terms of equity and fairness, he may well have earned and deserved the bestowal of the gift, the deciding factor is whether his aunt's intentions and motivations were competently expressed in a way that would be legally binding. Had the decedent's motivations and intentions been clearly expressed before her June and July hospitalizations, as they were in March when she signed her will, this court would have concluded without hesitation that the defendant did in fact have a legal right to his aunt's bank accounts. Having been expressed, however, during her hospitalization, when her healthcare providers were continually recording their concerns about her confusion, disorientation and lack of ability to make sound judgments, her intentions to leave her nephew the money in her bank accounts were not clearly and competently expressed.
Until the defendant refused to return the funds that were in his aunt's bank account, he was not subject to an action of conversion. His belief that he was legally entitled to the funds is evidence that he did not wrongfully or tortiously obtain them. However, the fact that his aunt was, in this court's opinion, incompetent to make the gift means that the estate of the decedent is, in fact, the rightful owner of the bank accounts. The plaintiff made demand for the funds. The defendant refused. The defendant is liable for conversion.
CONSTRUCTIVE FRAUD
The second count of the plaintiff's complaint alleges that the defendant's actions constituted a breach of the confidential or special relationship that he enjoyed with his aunt. The plaintiff cites Mitchell v. Mitchell, 31 Conn. App. 331, 334
(1993) for the definition of what constitutes a constructive fraud. In Mitchell, the court held that: "the breach of a confidential or special relationship forms the basis for liability under the doctrine of constructive fraud. The plaintiff CT Page 9841 must establish the existence of a confidential or special relationship. . . . Once such a relationship is found to exist, the burden shifts to the fiduciary to prove fair dealing by clear and convincing evidence." (Citations omitted.) Mitchell v.Mitchell, supra, 31 Conn. App. 334-5.
A fiduciary or confidential relationship is one characterized by "a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other." Dunham v.Dunham, 204 Conn. 303, 322, 528 A.2d 1123 (1987). Familial relationships do not, per se, give rise to a special relationship. Koizim v. Koizim, 181 Conn. 492, 495 n. 1,435 A.2d 1030 (1980); Cooper v. Cavallaro, 2 Conn. App. 622, 626,481 A.2d 101 (1984); Albuquerque v. Albuquerque, Superior Court, judicial district of Middlesex at Middletown, Docket No. 58738 (July 28, 1994, Gaffney, J.) Aff'd., 42 Conn. App. 284,679 A.2d 962 (1996).
The issue of whether or not the defendant held a fiduciary or special relationship with the decedent is difficult to decide. On the one hand, from the defendant's own testimony, it is clear that he enjoyed a favored and relied upon place in his aunt's life. He saw her regularly, spent holidays with her, took responsibility for her care in certain respects. The defendant was better educated and more knowledgeable than his aunt. They had a special relationship. On the other hand, until her admission to the hospital in 1997, his aunt managed her financial and personal business. She hired her own attorney to draft her will. She maintained her own banking accounts. She paid her own bills. She owned her own stock. She maintained her own home. On balance, the court finds that the plaintiff has not met his burden of proving that a fiduciary relationship existed between the defendant and the decedent. Therefore, judgment must enter for the defendant on this count.
UNDUE INFLUENCE
The last count in the plaintiff's complaint, the third count, alleges undue influence. In that count the plaintiff claims that the defendant "unduly influenced his aunt, the decedent, to place his name in survivorship on her bankbooks and to dispose of her stock all of which resulted in a disposition of her assets clearly indicative of undue influence." CT Page 9842
"`Undue influence' is the exercise of sufficient control over the person, the validity of whose act is brought in question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised. It is always a good ground for setting aside a conveyance procured thereby, when exercised to such an extent as to control the will of the grantor." (Internal quotation marks omitted.) Fritz v. Mazurek,156 Conn. 555, 560, 244 A.2d 368 (1968); see also Valley v.Fazzina, 187 Conn. 423, 435, 446 A.2d 1068 (1982). There are four elements that must be present in order for this court to find that there was undue influence in this case: "(1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence. . . . Relevant factors include age and physical and mental condition of the one alleged to have been influenced, whether he had independent or disinterested advice in the transaction . . . consideration or lack or inadequacy thereof for any contract made, necessities and distress of the person alleged to have been influenced, his predisposition to make the transfer in question, the extent of the transfer in relation to his whole worth . . . failure to provide for all of his children in case of a transfer to one of them, active solicitations and persuasions by the other party, and the relationship of the parties." (Internal quotation marks omitted. Internal citations omitted). Pickman v. Pickman,6 Conn. App. 271, 275-276, 505 A.2d 4 (1986)
Taking all of the necessary factors into consideration, this court finds that the decedent was in a position in which she could have been influenced. Her age and medical condition had left her with less foresight and poor judgement. The defendant had ample opportunity to unduly influence his aunt. He was alone with her for substantial periods of time. She relied upon him. The plaintiff offered some evidence to support a conclusion that the defendant had a disposition to exert influence. The plaintiff offered, however, no direct evidence of undue influence. Rather, the plaintiff urges this court to infer that there was undue influence from the actions of the defendant. Such an inference is not clearly supported by the evidence. There is some support for this conclusion. There is an equal amount of support for the opposite conclusion. This court finds the evidence to be evenly matched. Therefore, the plaintiff has failed to meet his burden of proving the claim of undue influence.
CONCLUSION
CT Page 9843
The defendant is entitled to judgment on Counts Two and Three, alleging constructive fraud and undue influence. Having reviewed all the facts in this matter, this court concludes that the plaintiff has met his burden of proving conversion. Accordingly, this court enters judgment in favor of the plaintiff on count one and orders that the defendant pay the plaintiff $183,705.97[1]. The plaintiff has provided this court with no legal authority to support his request for attorneys fees, therefore, the request for attorneys fees is denied.
ROBINSON, JUDGE, SUPERIOR COURT.